[Cite as *State v. Benson*, 2025-Ohio-1541.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                               :

    Plaintiff-Appellee,          :

                                    No. 113759

    v.                                         :

MARK A. BENSON, JR.,                    :

    Defendant-Appellant.      :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, REVERSED IN PART,
                  AND REMANDED
**RELEASED AND JOURNALIZED:**  May 1, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-684471-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Dominic Neville, Assistant Prosecuting
Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and
Noelle A. Powell-Sacks, Assistant Public Defender, *for
appellant.*

MICHAEL JOHN RYAN, P.J.:

{¶ 1} Defendant-appellant Mark Benson, Jr., challenges his convictions on firearm specifications, which were rendered after a jury trial.  After a thorough

review of the facts and pertinent case law, we affirm in part, reverse in part, and remand.

**Factual and Procedural History**

**The Indictment**

{¶ 2} In August 2023, a Cuyahoga County Grand Jury indicted Benson on the following charges:  Count 1, felonious assault in violation of R.C. 2903.11(A)(1) (knowingly cause serious physical harm); Count 2, felonious assault in violation of R.C. 2903.11(A)(2) (knowingly cause or attempt to cause physical harm by means of a deadly weapon or dangerous ordnance, to wit:  firearm and/or hammer); Count 3, abduction in violation of R.C. 2905.02(A)(1) (without privilege to do so, knowingly, by force or threat, remove the victim from the place where she was found); Count 4, abduction in violation of R.C. 2905.02(A)(2) (without privilege to do so, knowingly, by force or threat, restrain the liberty of the victim under circumstances that created a risk of physical harm to her or placed her in fear); Count 5, strangulation in violation of R.C. 2903.18(B)(2); Count 6, strangulation in violation of R.C. 2903.18(B)(3); and Count 7, abduction in violation of R.C. 2905.02(A)(2).

{¶ 3} With the exception of Count 7, all the counts contained one- and three-year firearm specifications.

**Facts as Elicited at Trial**

{¶ 4} The trial testimony established that Benson committed acts of violence against his then-girlfriend over the course of an evening and into the

following morning.  At the time, the two had been dating for approximately two years.

**{¶ 5}** On the evening in question, Benson and the victim went out for a night downtown; they drank alcohol, and the victim testified that she was "very" intoxicated and Benson was "tipsy."  After their night out, they were heading back to the victim's apartment and stopped at a gas station to purchase water and Gatorade.  The victim went into the gas station store to buy the drinks.

**{¶ 6}** The victim testified that as she was returning to the car from the store, she could see that Benson, who knew the passcode to unlock her phone, was scrolling through her phone.  The victim surmised that Benson had likely found messages she had exchanged with her ex-boyfriend, the father of her child.  She described her relationship with the ex-boyfriend at that time as "flirtatious."  The victim described the rest of the drive back to her apartment as "super quiet" and "awkward," with Benson not talking to her.

**{¶ 7}** When they arrived at the victim's apartment, Benson was still not speaking to the victim and he began packing his belongings he had at her place.  The victim was questioning Benson but he continued to ignore her, so the victim went into the bathroom to get ready for bed.

**{¶ 8}** The victim testified that while she was in the bathroom, Benson "stormed" into the bathroom, pushed her into the tub, and began punching her with a closed fist.  The hits caused her right eye to swell to the point she was not able to see out of it.

{¶ 9} Benson then told the victim to get a hammer, which she did. The victim testified that Benson told her to hit herself on one of her teeth with the hammer; she initially refused. The two "went back and forth" about it and eventually "worked collaboratively" to break her tooth. The victim explained that she cooperated with Benson's demand because she thought it would calm him down.

{¶ 10} After the bathroom incident, Benson told the victim to get her handgun, a loaded 9 mm Ruger. She retrieved the weapon and gave it to Benson. Benson then told the victim they were leaving her apartment. The two started walking to Benson's car, with the victim walking ahead of Benson. The victim testified that Benson had the gun and it was pointed downward. Once in the car, Benson told the victim they were going to Edgewater Park on Lake Erie. Benson drove to the park; license plate readers confirmed that his vehicle was there.

{¶ 11} According to the victim's testimony, the gun was between the driver's seat and front console as they drove to the park. Once at the park, Benson directed the victim to get out of the car and they walked to the edge of the water, whereupon Benson told her to close her eyes and she complied. The victim did not know where the gun was during this time. The victim ran, but Benson caught her and returned her to the same spot. The victim ran a second time and Benson again caught her, bit her on her face, and punched her in the stomach, which caused her to fall to the ground. After falling she felt a pain in her back. After the assault was over, the two returned to Benson's car, where the victim saw that the gun was in the same spot it had been previously.

{¶ 12} Benson then drove the two to his apartment. He demanded the victim unlock her phone. The victim put in the wrong passcode several times and disabled the phone, which prompted Benson to choke her. The choking happened several times, because Benson demanded the victim unlock her phone but she was unable to. The victim testified that the choking incidents took place in Benson's living room and her gun was in his bedroom. According to the victim, her phone was disabled until the following morning.

{¶ 13} After the choking incidents, Benson demanded that she call her ex-boyfriend and tell him that her flirtatious tone with him had been a lie. The victim testified that she indeed called the ex-boyfriend but was not sure how she had placed the call because her phone was disabled. According to the victim, while she was on the phone with the ex-boyfriend, Benson would hit her if he was dissatisfied with what she was saying to the ex-boyfriend. They were in Benson's bedroom at this time and, in addition to her gun, one of Benson's guns was also there; both guns were on a dresser. The victim's testimony was inconsistent about whether Benson ever pointed a gun at her during this time: at one point she denied recalling that a gun was ever pointed at her; at another point she testified that she did not recall if a gun had been pointed at her; and at yet another point she testified that Benson "might have, like, pointed [a gun]" towards her while she was on the phone.

{¶ 14} The victim testified that both she and Benson took "bathroom breaks" during this time. At one point while Benson was in the bathroom, she attempted to escape, but Benson caught her and bit her on the face. After that, they were in the

bathroom together and Benson cut off her ponytail. The events ended when the victim and Benson got in bed together and went to sleep.

{¶ 15} The following morning, the victim and Benson agreed that they would tell people that she got "jumped" downtown should anyone ask about her appearance and injuries. The two went together in Benson's car to pick up his daughter and returned to his apartment. The victim's daughter had been at her grandmother's house, and the grandmother called the victim and requested that she get her daughter. The victim borrowed Benson's car to pick up her daughter.

{¶ 16} At the grandmother's house, the victim's family expressed concern after seeing her injuries — they had already been concerned because they had been calling her the night before and the victim did not answer her phone. The family convinced the victim to call the police, who responded to the grandmother's house.

{¶ 17} During the 911 call, which was played at trial, the victim told dispatch that Benson had taken her gun and hit her with it. She further stated that her gun was on a dresser along with one of Benson's guns. Although the victim admitted at trial that she did not see Benson handle any of his guns on the evening of the incident, she explained that she mentioned Benson's gun to the dispatcher because she knew he had weapons in his house.

{¶ 18} After speaking with the police, the victim went to the hospital. She had swelling, scratches, bruising, and sustained two broken vertebrae and a broken orbital wall. The victim testified that she sustained the orbital facture when Benson hit her with a closed fist in her bathroom. She testified that she sustained the broken

vertebrae when she fell to the ground after Benson punched her in the stomach at Edgewater Park.

{¶ 19} The police arrested Benson the day after the incident and conducted a search of his residence and vehicle. They recovered two weapons belonging to Benson; the victim's weapon was never recovered. The victim maintained that her gun was either in Benson's residence or vehicle.

**Crim.R. 29 Motion for Judgment of Acquittal**

{¶ 20} At the close of the State's presentation of evidence, the defense made a Crim.R. 29 motion for judgment of acquittal — the motion was made specifically as to the gun specifications. The trial court denied the motion. The defense did not present any witnesses and renewed its Crim.R. 29 motion, which the trial court again denied.

**Verdict and Sentence**

{¶ 21} After its deliberations, the jury found Benson guilty of Count 1, felonious assault (knowingly cause serious physical harm) and both the one- and three-year firearm specifications; Count 3, abduction (without privilege to do so, knowingly, by force or threat, remove the victim from the place where she was found) and guilty of only the three-year firearm specification; and Count 4, abduction (without privilege to do so, knowingly, by force or threat, restrain the liberty of the victim under circumstances that created a risk of physical harm to her or placed her in fear) and only the three-year firearm specification.

{¶ 22} The jury returned not guilty verdicts on the one-year firearm specifications attendant to Counts 3 and 4, abduction, as well as Counts 2, felonious assault (knowingly cause or attempt to cause physical harm by means of a deadly weapon or dangerous ordnance, to wit: firearm and/or hammer), Counts 5 and 6, strangulation, Count 7, abduction, and the firearm specifications attendant to those counts.

{¶ 23} On Count 1, the trial court sentenced Benson to four years plus a two-year tail under the Reagan Tokes law and three years on the three-year firearm specification; on Count 3, the court imposed 18 months and three years on the three-year firearm specification; and on Count 4, the court sentenced Benson to 18 months. The underlying counts were ordered to be served concurrently; the two three-year gun specifications were ordered to be served consecutively to each other and to the sentence on the underlying counts. Thus, Benson was ordered to serve a ten-to-12-year prison term, with six years of the sentence being for gun specifications.

**Assignments of Error**

{¶ 24} Benson now appeals, raising two assignments of error for our review:

I.  There was insufficient evidence to prove all the firearm specifications of which Mark Benson was convicted.

II. Mark Benson's convictions for firearm specifications were against the manifest weight of the evidence.

**Law and Analysis**

**Sufficiency of Evidence**

{¶ 25} In his first assignment of error, Benson contends that the evidence was insufficient to sustain the firearm specifications.

{¶ 26} When determining whether a verdict is supported by sufficient evidence, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Wilks*, 2018-Ohio-1562, ¶ 156, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. When evaluating the sufficiency of the evidence, a reviewing court considers "whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *Jenks* at paragraph two of the syllabus.

{¶ 27} R.C. 2941.141(A) governs one-year firearm specifications and charges "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense." R.C. 2941.145(A) governs three-year firearm specifications and charges "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶ 28} We first consider the convictions for the one- and three-year firearm specifications attendant to Count 1, felonious assault (knowingly cause serious

physical harm).  Relevant to this appeal, R.C. 2901.01(A)(5) defines serious physical

harm to persons as:

> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> . . .
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 29} The record reveals that there were two injuries the victim sustained

that constituted serious physical harm:  her orbital fracture and her broken

vertebrae.   The victim testified that she sustained the orbital fracture in the

bathroom at her house *before* Benson told her to her gun.  The State admitted as

much at oral argument.

{¶ 30} The victim further testified that she sustained the broken vertebrae

when she and Benson were at Edgewater Park.  Benson did not have his gun at that

time, because he left it in his car.  Again, the State conceded as much at oral

argument.

{¶ 31}  The State's rationalization for the gun specifications — to the extent

they relate to the assault on the beach — is that the victim did not know where the

gun was; she discovered when they got back to the car that Benson had left it in the

car.  We realize that there were times on the beach when the victim had her eyes

closed, but in addition to not ever seeing the gun (because Benson did not have it

then), she also did not testify that Benson ever threatened her with the gun while they were on the beach.

{¶ 32} On this record, the evidence was insufficient to support that Benson had a firearm on or about his person or under his control while assaulting the victim (one-year firearm specification) or that he had a firearm on or about his person or under his control while committing the offense and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the offense (three-year firearm specification). *See State v. Ivory*, 2015-Ohio-4373, ¶ 17 (8th Dist.) (evidence insufficient to sustain conviction for felonious assault by causing or attempting to cause physical harm by means of a deadly weapon or dangerous ordnance where victim never observed a gun in the defendant's possession or witnessed the defendant displaying or brandishing a gun, threatening the victim with a gun, indicating he would use a gun, pointing the gun at the victim, or shooting a gun).

{¶ 33} In light of the above, the evidence was insufficient to sustain the gun specifications attendant to Count 1.[1]

{¶ 34} Further, the evidence was insufficient to sustain the three-year firearm specification on the abduction charge in Count 4. Count 4 charged that

---

[1] As mentioned, Benson was charged with two counts of felonious assault, the second, charged in Count 2 under R.C. 2903.11(A)(2), alleged that he knowingly caused or attempted to cause physical harm to the victim "by means of a deadly weapon or dangerous ordnance, to wit: firearm and/or hammer." Based on the testimony, this count could have correlated to the victim's testimony about the chipping of the tooth incident or the victim telling the 911 dispatcher that Benson had hit her with a gun. In any event, the jury found Benson not guilty on this count.

Benson, "without privilege to do so, knowingly, by force or threat, restrained the liberty of [the victim] under circumstances that created a risk of physical harm to [her] or placed her in fear." This count correlated with Benson capturing the victim after she ran at the beach. Again, Benson did not have the gun while they were on the beach, and he never indicated that he did.

{¶ 35} The evidence was sufficient, however, to sustain the three-year gun specification attendant to the abduction conviction in Count 3. That count charged that Benson "without privilege to do so, knowingly, by force or threat, remove[d] [the victim] from the place where she was found." This count related to Benson guiding the victim to the car, with a gun in his hand, so that he could take her to Edgewater Park. The evidence was sufficient to sustain the gun specification attendant to this count.

{¶ 36} We note that in its opposition to the defense's Crim.R. 29 motion for judgment of acquittal on the gun specifications, the State argued to the trial court, "[y]ou heard evidence from [the victim] that the defendant had access to a nearby firearm throughout the commission of *almost all of the counts* in the indictment." (Emphasis added.) Tr. 458. The indictment contained seven counts and all but one, Count 7, abduction, which the jury acquitted Benson of, contained firearm specifications. If the State had intended to refer solely to Count 7, it likely would have said so explicitly.

{¶ 37} We are not persuaded by the State's assertion that Benson inflicted a night of terror on the victim and, therefore, under the totality of the circumstances,

sufficient evidence supported all the gun specifications. It is a long-standing tenet of the law that

> each count of an indictment charges a complete offense; that the separate counts of an indictment are not interdependent, but are, and necessarily must be, each complete in itself, and that in determining the effect of a verdict that responds by designation to a given count the other counts of the indictment will be ignored, and the response of the jury to such other counts likewise ignored; that an inconsistency does not arise, unless it arises out of inconsistent responses to the same count.

*Browning v. State*, 120 Ohio St. 62, 71 (1929).

{¶ 38} Likewise, a gun specification and whether the offender was armed with a gun in the commission of an offense are distinct considerations. *State v. Nowlin*, 115 Ohio App.3d 778, 782 (4th Dist. 1996). Where the State seeks to enhance a defendant's sentence via a gun specification, "the specification must appear in the indictment and be proven beyond a reasonable doubt." *Id.* The evidence presented at trial bears out that it was a night of terror for the victim and we do not discount the injuries she suffered. Indeed, it appears that Benson himself does not discount them, either, because his challenges in this appeal only relate to the gun specifications and not the underlying convictions.

{¶ 39} In light of the above, we find merit to Benson's contention regarding the sufficiency of the evidence relative to the gun specifications attendant to Counts 1 and 4.

{¶ 40} Within this first assignment of error, Benson also raises an inconsistency challenge to the jury's finding of not guilty on the one-year firearm

specification, but guilty on the three-year firearm specification, which, given our decision as to Count 4, is a live controversy relative only to Count 3, abduction.

{¶ 41} This court has addressed this challenge and found such verdicts not inconsistent. *See State v. Tate*, 2024-Ohio-5319, ¶ 19-24 (8th Dist.), for an analysis of this court's reasoning and citation to other precedent. We decline to stray from this court's precedent.

{¶ 42} Thus, we sustain Benson's first assignment of error as it relates to the gun specifications attendant to Counts 1 and 4 and overrule it as it relates to Count 3.

**Weight of the Evidence**

{¶ 43} In Benson's second assignment of error, he contends that the convictions on the firearm specifications were against the manifest weight of the evidence.

{¶ 44} When evaluating a claim that a verdict is against the manifest weight of the evidence, "we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *Wilks*, 2018-Ohio-1562, at ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversing a conviction based upon the weight of the evidence should occur "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 45} Again, given our disposition on the firearm specifications attendant to Counts 1 and 4, Benson's weight-of-the-evidence challenge is a live controversy only as it relates to Count 3, abduction. As mentioned, that count was relative to Benson removing the victim from her residence to take her to Edgewater Park.

{¶ 46} The gist of Benson's challenge relating to this count is that the gun used during the offense (the victim's gun) was never recovered and that, along with other inconsistencies in the victim's account of events, led to her being incredible.

{¶ 47} The fact that no gun is recovered does not preclude a defendant's convictions under firearm enhancement specifications. *State v. Williams*, 2004-Ohio-5602, ¶ 11 (8th Dist.). As to alleged inconsistencies in the victim's testimony, this is not the exceptional case in which the evidence weighs heavily against the firearm specification conviction under Count 3. The victim testified that she gave Benson her gun, at his request, after the first assault in her bathroom and Benson told her that they were going to Edgewater Park. They walked out of her residence, with the victim in front and Benson behind her; Benson had her gun, and he held it pointing downward.

{¶ 48} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we do not find the trial court clearly lost its way and created such a manifest miscarriage of justice that the conviction on the firearm specification attendant to Count 3 must be reversed.

{¶ 49} The second assignment of error is overruled.

**Conclusion**

{¶ 50} Judgment affirmed in part and reversed in part; the conviction on the three-year firearm specification attendant to Count 3 is affirmed; the convictions on the one- and three-year firearm specifications attendant to Count 1 and the three-year firearm specification attendant to Count 4 are reversed.  The case is remanded for resentencing limited to deletion of the relevant firearm specifications.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, PRESIDING JUDGE

ANITA LASTER MAYS, J., CONCURS;
DEENA R. CALABRESE, J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE OPINION)

DEENA R. CALABRESE, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 51} I concur with the majority's conclusion that the evidence was sufficient to uphold the three-year firearm specification attached to Count 3 of the indictment, abduction in violation of R.C. 2905.02(A)(1).  The victim testified that before the drive to Edgewater Park, she handed Benson her handgun, Benson said "Let's go,"

and Benson held the firearm in his hand to facilitate her compliance as he led her to his car. (Tr. 224-227, 297.) The victim testified:

> Q.   Was he pointing the firearm at you?
>
> A.   He had it in his hand and I walked in front of him.
>
> Q.   So exactly where? Show us. Where was the firearm? You can do it with your finger like he had it with his hand. Was it pointed, was it down?
>
> A.   In hand pointed down, like just carried ready to like — like a western showdown, you carry it on your side and you're ready to pull it out and shoot whenever. But it wasn't in a pocket, it was in hand.

(Tr. 226.)

{¶ 52} This was sufficient evidence to establish that Benson used a firearm to facilitate forcibly removing the victim from her apartment, thereby supporting the three-year firearm specification. I also fully concur with the majority's conclusion that this verdict was not against the manifest weight of the evidence.

{¶ 53} I respectfully dissent, however, from the majority's decision to reverse the jury's guilty verdicts with respect to the one- and three-year firearm specifications attendant to Count 1, felonious assault in violation of R.C. 2903.11(A)(1), and the three-year specification attendant to Count 4, abduction in violation of R.C. 2905.02(A)(2). I would instead find that the evidence was sufficient to support the verdicts on these specifications and that the verdicts were not against the manifest weight of the evidence.

## A. Count 1 — Felonious Assault and Attendant Firearm Specifications

{¶ 54} The majority, citing only the categories of "serious physical harm" spelled out in subsections (c) and (e) of R.C. 2901.01(A)(5), limits the scope of the felonious assault in Count 1 to two physical injuries, namely, the orbital fracture inflicted when Benson assaulted the victim in her own bathroom and the vertebrae injuries she sustained when Benson assaulted her at Edgewater Park. I part ways with the majority because I agree with the State that in this case, "serious physical harm" is not limited to the orbital fracture and vertebrae injuries, that the felonious assault continued in Benson's bedroom with the punching and emotional abuse of an already battered victim, and that the guilty verdicts on the firearm specifications are therefore directly supported by the victim's testimony with respect to a firearm in the bedroom. Benson had a gun within reach during the continued assault in his bedroom, and he used it to facilitate the continuing physical and psychological abuse, which aligns with the jury's guilty verdict on the one- and three-year firearm specifications.

{¶ 55} As the majority notes, at oral argument, the State conceded that Benson did not have a firearm on or about his person or under his control while meting out the beatings at the victim's apartment and at Edgewater Park. Following that concession, however, the State remarked that Benson continued to beat the victim in his bedroom after the two had returned from Edgewater Park, that there was a firearm on the dresser "within reaching distance of him, and under his control" during those beatings, and that felonious assault is not limited to "broken bones" or

"stitches" but also includes "mental" harm. The State even noted at oral argument that the victim testified she continued to go to therapy related to the psychological harm caused by the terror Benson inflicted.

{¶ 56} Far more important than oral argument, however, are the evidence and jury instructions. The trial court's jury instructions provided the legislature's complete definition of "serious physical harm" in R.C. 2901.01(A)(5), which includes not only the subsections quoted by the majority but also "[a]ny mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment[.]" R.C. 2901.01(A)(5)(a). The victim testified that while she and Benson were in his bedroom, she complied with his demands that she call her child's father and say hurtful things to him. (Tr. 240.) If Benson was displeased with her comments, "he would punch me on the arm or the leg kind of hinting at, you know, try harder, I don't sound good enough. And that happened for 20 minutes." (Tr. 240-241.) In evaluating potential mental harm, it is important to keep in mind that Benson heaped this continuing emotional and physical abuse on the victim after he had already severely beaten her in her own apartment and after he had punched and psychologically terrorized her at Edgewater Park.

{¶ 57} At trial, a detective testified that the victim "definitely did ask for" mental-health services in connection with the incident and that he provided a referral. (Tr. 420-421.) Even more compellingly, the victim testified to the terror she felt throughout the episode of physical and emotional abuse in the bedroom, to the ongoing psychological disturbance the entire incident caused, and that she was

still seeing a therapist at the time of trial. (Tr. 266-267.) The incident occurred in late August 2023, and the victim testified on February 1, 2024; she had therefore been seeing a therapist for more than five months since the incident occurred. Her testimony established that the felonious assault continued in Benson's bedroom in the form of both physical and emotional abuse, with "serious physical harm" in the form of an ongoing serious mental-health condition requiring treatment. *See State v. Carpenter*, 2011-Ohio-211, ¶ 13 (8th Dist.) (affirming felonious-assault conviction where defendant caused victim to have a mental breakdown by subjecting her to, *inter alia*, physical, verbal, and emotional abuse). Moreover, this court has rejected the notion that expert testimony is required to prove serious physical harm, including in the context of mental-health conditions. *State v. Palmer*, 2022-Ohio-2955, ¶ 17 (8th Dist.).

{¶ 58} Once the physical and emotional abuse of the victim in Benson's bedroom is properly viewed as a component of the ongoing felonious assault, the one- and three-year firearm specifications attached to Count 1 are supported by sufficient evidence. With respect to the location of a gun during these events, the victim testified that it was within Benson's reach:

Q. How far were you away from the firearm?

A. Across the room.

Q. How far was he from the firearm?

A. A bit closer.

Q. Was it within reaching distance of him?

A.     Yes.

(Tr. 241.)   While the majority highlights some inconsistencies in the victim's testimony as to whether Benson pointed the firearm at her during this chapter of the assault, this court has held that "[t]he trier of fact may 'believe or disbelieve any witness or accept part of what a witness says and reject the rest.'"  *Cleveland v. Johns*, 2024-Ohio-3301, ¶ 24 (8th Dist.), quoting *State v. Metz*, 2019-Ohio-4054, ¶ 70 (8th Dist.).   More importantly, the victim was consistent in testifying that Benson had a firearm within reach on the bedroom dresser during the continuing assault.

{¶ 59} The testimony further supported a finding that the firearm *facilitated* Benson's continued physical and emotional assault on the victim.  In *State v. Jones*, 2019-Ohio-5237 (8th Dist.), this court discussed the legislative intent underlying the firearm-specification statute, noting the Ohio Supreme Court's determination that "'[t]he purpose of a firearm specification is to enhance the punishment of criminals who voluntarily introduce a firearm while committing an offense and to deter criminals from using firearms,'" in part because "'a criminal with a gun is both *more dangerous* and harder to apprehend than one without a gun.'"  (Emphasis added.)  *Id*. at ¶ 47, quoting *State v. White*, 2015-Ohio-492, ¶ 31.  This court also cited, with approval, *State v. Myrick*, 2011-Ohio-244 (2d Dist.), in which the Second District adopted the Oxford English Dictionary's definition for the meaning of "facilitates," finding that "[a] thing that 'facilitates' 'make[s] (an action or process) easy or easier.'"  *Jones* at ¶ 46, quoting *Myrick* at ¶ 85.  Furthermore, the use of a firearm

may facilitate the underlying offense, thereby supporting a three-year firearm specification under R.C. 2941.145(A), "'even if the offender never states that he will use the gun if the victim does not comply with his orders[.]'" *State v. Lee*, 2018-Ohio-1523, ¶ 28 (8th Dist.), quoting *State v. Watkins*, 2004-Ohio-6908, ¶ 17 (8th Dist.); *State v. Cummings*, 2018-Ohio-4214, ¶ 22 (8th Dist.). *See also id.* at ¶ 29 (victims "behaved in a way that is consistent with them believing that [defendant] would discharge [the] gun)."

{¶ 60} The evidence was sufficient to support the jury's guilty verdicts on the one- and three-year firearm specifications attendant to Count 1 of the indictment. Furthermore, viewing all of the evidence and applying the manifest-weight standard adopted by the majority, I would find that those convictions were not against the manifest weight of the evidence.

### B. Count 4 — Abduction and Attendant Firearm Specification

{¶ 61} As the majority indicates, Count 4 charged that Benson, "without privilege to do so, knowingly, by force or threat, restrained the liberty of [the victim] under circumstances that created a risk of physical harm to [her] or placed her in fear." The jury returned a verdict of guilty as to the underlying offense, as well as a guilty verdict as to the three-year firearm specification.

{¶ 62} As with Count 1, there was sufficient evidence to tie Count 4 to events that occurred in Benson's bedroom after the couple returned from Edgewater Park, and therefore to support the attendant firearm specification verdict. Benson held the victim in his bedroom by force or threat. The victim actually testified that while

Benson was in the bathroom, she attempted to escape. She "only got as far as out the door," where Benson caught her. (Tr. 243.) After that, she remained in the bedroom, with Benson's firearm on the dresser. The victim testified she even accompanied Benson in the car the next morning because she "[did not] really think [she] had the power to say no," and that she was "afraid." (Tr. 250.) Asked what she was afraid of, the victim testified: "Dying." *Id.*

{¶ 63} Respectfully, I believe the majority once again erroneously focuses on a narrow set of facts as potentially relevant to this count rather than considering all the evidence available to the jury. The majority states that Count 4 correlates to Benson capturing the victim after she attempted to run away from him at Edgewater Park. The State suggested that correlation in its closing argument and instead tied Benson's actions in catching and restraining the victim in his apartment to Count 7 of the indictment, on which the jury returned a verdict of not guilty.

{¶ 64} The State's remarks during closing as to Count 7, however, do not align with the indictment. The State said in closing that "Count seven . . . is that time, folks, when they got back to his apartment and she tried to run, she tried to run from his apartment and he went out and he got her and he dragged her back into his apartment because he wasn't done with her." (Tr. 528-529.) Count 7 of the indictment, however — like the corresponding jury instruction — specifically refers to events occurring on or about April 24, 2023, more than four months before the events that formed the basis for the remaining counts. According to the victim's testimony, the events of April 24, 2023, had nothing to do with Benson's apartment.

The State had actually elicited testimony with respect to an incident between the victim and Benson at her grandmother's house on April 24, 2023.

{¶ 65} All of this highlights the importance of the axiom, included in the trial court's jury instructions, that closing arguments are not evidence, but merely "an opportunity to comment on the evidence." *State v. Virostek*, 2022-Ohio-1397, ¶ 99 (8th Dist.). *See also State v. Jackson*, 2023-Ohio-455, ¶ 45 (8th Dist.); *State v. Weems*, 2013-Ohio-1343, ¶ 18 (8th Dist.). The State, in its closing, was tasked with commenting, in a limited amount of time, on evidence related to a seven-count indictment. The jury, by contrast, was responsible for evaluating all of the evidence in light of the trial court's jury instructions. "A jury is presumed to follow the instructions given to it by the trial judge." *State v. Allie*, 2024-Ohio-2262, ¶ 49 (8th Dist.), citing *State v. Loza*, 71 Ohio St.3d 61, 75 (1994). The evidence tied Count 4 of the indictment to events occurring at Benson's apartment. At that point, the same firearm-specification analysis applicable to Count 1 carries over to Count 4. The victim's testimony was sufficient to establish that Benson had a firearm within reach while in the bedroom and that Benson used it to facilitate the underlying offense.

{¶ 66} I would therefore affirm the jury's verdict on the three-year firearm specification attached to Count 4 of the indictment. The evidence above was sufficient to support a conviction on the three-year firearm specification. Furthermore, viewing all of the evidence and once again applying the manifest-weight standard adopted by the majority, I would find that the firearm specification conviction was not against the manifest weight of the evidence.

{¶ 67} For all of the above reasons, I concur with the majority's conclusion that the evidence was sufficient to uphold the three-year firearm specification attached to Count 3 of the indictment. As to the majority's findings regarding the firearm specifications attached to Counts 1 and 4, however, I respectfully dissent.